## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Dennis Ryan, Jr., as trustee for the heirs and
next of kin of Jerome Deon Ladette Harrell,

                              Plaintiff,
                                                    Civ. No. 14-1776 (RHK/LIB)
v.                                                  **MEMORANDUM OPINION
                                                    AND ORDER**
Officer Mary Armstrong, *et al.*,

                              Defendants.

---

Kenneth U. Udoibok, Kenneth Ubong Udoibok, P.A., Minneapolis, Minnesota, for
Plaintiff.

Jason M. Hively, Jon K. Iverson, Iverson Reuvers Condon, Bloomington, Minnesota, for
Defendants.

---

## INTRODUCTION

During the evening of February 23, 2012, Jerome Deon Ladette Harrell turned

himself in to the Stearns County Jail (the "Jail") on two outstanding Hennepin County

traffic warrants.  After exhibiting odd and erratic behavior throughout the night, he was

pronounced dead the following morning.  The trustee of Harrell's estate, Dennis Ryan,

Jr., brings this civil-rights action against Stearns County and several Stearns County

Corrections Officers ("SCCOs") in their individual and official capacities (collectively,

"Defendants"), alleging violations of the Eighth and Fourteenth Amendments.  Presently

before the Court is Defendants' Motion for Summary Judgment.  For the reasons that

follow, the Motion will be granted.

# BACKGROUND

Viewed in the light most favorable to Ryan, the record reveals the following, largely undisputed, facts. On February 23, 2012, at around 7:10 p.m., Harrell arrived at the Stearns County Sheriff's Office to turn himself in for two outstanding Hennepin County warrants for failing to have proof of car insurance. (See Hively Aff. Ex. J, Captain Lahr Mem.) Hennepin County requested that Stearns County hold him until transport could be arranged. (Id.)

## I.    Harrell is booked into the Jail

Harrell was booked into the Jail at approximately 7:25 p.m. (Hively Aff. Ex. J, Detention Report; Boerger Incident Report, Dreher Incident Report.)[1] According to the Initial Classification Worksheet filled out by a booking officer—it is unclear who— Harrell did not express or indicate an intent to harm himself or others, and was initially cooperative and responsive. (Hively Aff. Ex. J, Initial Classification Worksheet and Questionnaire.) Yet, it was noted that Harrell "appeared high on something." (Id.) Harrell was asked questions about his medical history, including his current mental and physical health, to which he gave yes-or-no answers. (Id.) He did, however, respond that he had been drunk and high two days earlier and that he used marijuana. (Id.) SCCO Kellen Boerger, one of the booking officers on duty that evening, thought Harrell

---

[1] All Incident Reports and Statements of SCCOs can be found in Hively Affidavit Ex. J. and Udoibok Affidavit Ex. 1.

"appeared anxious and was unable to concentrate on [the] questions."[2]  (Boerger Incident Report.)  After being finger-printed, Harrell began talking to himself and unsuccessfully attempted to enroll in the Jail's phone system.  (Id.)  Because of the hold placed on him and the fact that he "appear[ed] high," he was placed in the booking unit, where inmates who are under the influence of drugs or alcohol are placed.  (See Initial Classification Worksheet; Armstrong Dep. at 88–89.)

SCCO's are required to conduct well-being checks ("WBCs") on inmates twice an hour.  (See Armstrong Dep. at 22, 31.)  Boerger conducted several WBCs during the remainder of his shift, which ended at 11:00 p.m. (Culloton Dep. at 20, 35), and found Harrell lying down in his cell each time.  (Boerger Incident Report).

## II.   Harrell exhibits odd behavior during the midnight shift

SCCOs Mary Armstrong and Patrick Culloton were assigned to the booking unit during the midnight shift (from 11:00 p.m. to 6:45 a.m.).[3]  (Armstrong Incident Report;

---

[2] The record reveals that Harrell was confused when he arrived at the Jail.  During the booking process, he informed SCCO Boerger and Michael Dreher that he wanted to "come clean" about a shooting at St. Cloud State University a few days earlier.  (Boerger Incident Report.)  Harrell heard the suspect was wearing a face mask and had tattoos on his hands—despite this, he was still under the impression that he was a suspect and wanted to help the police figure it out.  (Dreher Incident Report.)  Then, Harrell informed Boerger that he wanted to change his statement and that he had just watched the "Tupac documentary," which recounted the life and death of rap artist Tupac Shakur.  (Dreher Incident Report.)  Later that evening, Harrell met with a St. Cloud Police Department detective to discuss his knowledge of the shooting and was visibly anxious afterwards.  (Boerger Incident Report.)

[3] There is no medical staff at the Jail throughout the night, but medical staff is on-call for emergency situations.  (Armstrong Dep. at 50–51; Culloton Dep. at 30–31.)  If a SCCO decides an inmate was suffering a medical emergency—such as engaging in self-harming or suicidal behavior—a call would be placed to a supervisor, who would alert the on-call medical staff.  (Culloton Dep. at 13, 19, 28, 30–31; Armstrong Dep. at 46–47, 51; see also Gacke Dep. at 10–13, 33.)

Armstrong Dep. at 34, 39; Culloton Incident Report.)  When they came on duty, they were informed that Harrell was high and acting strangely.  (Culloton Incident Report; <u>see</u> Armstrong Dep. at 35.)  Both officers conducted WBCs on Harrell throughout the night, in addition to some other midnight-shift SCCOs.  (<u>See</u> Culloton Dep. at 25–26.)

During her WBCs, Armstrong observed Harrell "spring up from his bunk with lunging movements and start moving his body as though he was an animal and [] make loud howling and screaming vocals."  (Armstrong Incident Report.)  Similarly, Culloton observed Harrell bang on his cell door and make loud noises, to the point where other inmates asked officers to make him quiet down.  (Culloton Incident Report.)  Culloton watched Harrell pace in his cell and stare out the window, and at one point, Harrell was lying down, covered by his blanket, and appeared to be sleeping.  (<u>Id.</u>)  However, Culloton soon heard him making noises again.  (<u>Id.</u>)  Later in the night, Harrell disrobed, flooded his cell, and started throwing water around.  (Culloton Dep. at 48.)

Culloton repeatedly testified in his deposition that he did not have any contact, verbal or otherwise, with Harrell during his shift.  (<u>Id.</u> at 40, 46; Culloton Incident Report.)  Armstrong could not recall whether she had any verbal contact with Harrell. (Armstrong Dep. at 63.)  Yet, there is no evidence in the record indicating that Harrell asked for help or medical attention.  (<u>See</u> <u>id.</u> at 49 (stating that she could not decipher what he was saying, except for "fuck you"), 72.)

Armstrong and Culloton did not believe Harrell's behavior indicated an emergency situation.  (Culloton Dep. at 40, 47, 51; Armstrong Dep. at 40, 43, 47–48, 51– 52, 60, 74, 87.)  Hence, they did not alert their supervisor, Sergeant Salzer, and the on-

4

call medical staff was not contacted.  However, each officer informed the oncoming

SCCOs of Harrell's behavior at the change-of-shift meeting at 6:45 a.m.  (Culloton Dep.

at 42; Armstrong Dep. at 42; Armstrong Incident Report; Culloton Incident Report.)

## III.   Shift turnover

Around 6:45 a.m. on February 24, 2012, Salzer advised the oncoming dayshift

supervisors, Sergeants Pamela Gacke and Mark Maslonkowski, that Harrell was "acting

very odd [and] making strange noises," like monkey noises.  (Gacke Incident Report;

Gacke Statement; Maslonkowski Incident Report.)  One of Gacke's duties at the

beginning of a day shift was to report to medical staff—who came on duty at

approximately 7:00 a.m.—the booking-unit inmates needing to be assessed.  (Gacke

Incident Report; Gacke Dep. at 20–21, 38, 55.)  She advised Jail Nurse Lil Grandlund

that she should see Harrell due to his odd behavior.  (Gacke Incident Report; Gacke

Statement; Gacke Dep. at 55.)

Meanwhile, SCCO Mark Hill, the booking-unit supervisor that day, performed the

dayshift's first WBC on Harrell at 6:55 a.m.  Hill observed him howling, pounding on the

door, and splashing water from the sink all over his cell with a sheet.  (Hill Statement;

Hill Incident Report.)  An hour later, Hill reported Harrell was still yelling, pounding, and

had the wet sheet draped over his naked body.  (Hill Incident Report.)

## IV.   Jail medical staff makes an initial assessment

The record reveals that by 7:30 a.m., medical staff was informed that Harrell was

pounding and hollering continually and flooding his cell; it is unclear, however, whether

they personally observed this behavior.  (Hively Aff. Ex. J, Medical Staff Note.)  Based

on this information, Grandlund informed Maslonkowski that Harrell should be placed in a restraint chair and would be assessed when his behavior permitted her to safely conduct an evaluation.[4] (Id.; Maslonkowski Incident Report.)

Based on Grandlund's request for restraint, SCCO Gilbert Michalski was ordered to perform a one-on-one observation of Harrell until staff was available to move him. (Michalski Incident Report; see also Maslonkowski Incident Report.)  Harrell was "vocalizing a lot of nonsense . . . just yelling out odd things.  And he was splashing in the water, [and] splashing water on him[self] inside the cell."  (Michalski Statement.)  SCCO Craig Stowell, an experienced EMT, also observed Harrell in his cell after Grandlund made her request.  (See Stowell Dep. at 9–10.)  Harrell was naked, yelling inaudible animal noises, kicking and banging on his cell door, and jumping.  (Stowell Statement.)

Meanwhile, Maslonkowski relayed Grandlund's request to Gacke, and both went to Harrell's cell.  (Maslonkowski Incident Report; Gacke Incident Report.)  Maslonkowski videotaped Harrell to document his behavior while Gacke, thinking Harrell might be faking his symptoms, attempted to talk to him and calm him down.  (Maslonkowski Statement; Gacke Statement; Gacke Dep. at 24, 51–52.)  At this time, Harrell had a blanket and sheet wrapped around his head and naked body, and was kicking and hitting the door, putting his head over by his sink and jumping in the water, and making a number of screaming type noises that were not verbal language.

---

[4] Also around this time, Hennepin County informed Stearns County that it should drop the hold on Harrell, issue him a court date, and release him.  (Gertken Incident Report.)  However, Stearns County Jail medical staff determined that Harrell was "in no state to be physically released from [the] facility."  (Id.)

(Maslonkowski Statement; see also Udoibok Aff. Ex. 2, Stearns County Jail Video.)  He continued to kick and yell, despite Gacke's attempts to calm him down.  (Gacke Incident Report; see also Jail Video.)

**V.      Harrell is extracted from his cell**

Based on Harrell's agitated behavior and Grandlund's request, Maslonkowski and Gacke decided to assemble a cell-extraction team, called a Special Operations Response Team ("SORT"), composed of four specially-trained SCCOs.  (Gacke Dep. at 45.)  The SORT included SCCOs Stowell, Michalski, Joseph Klebs, and Adam Seifermann.  The SORT officers were to don protective gear, enter Harrell's cell, restrain him, and put him in the restraint chair for medical assessment.  (Maslonkowski Statement; Gacke Incident Report; Stowell Dep. at 16–18.)  While they were gearing up, the SORT members discussed Harrell's behavior, the general procedure for the extraction—what order they would enter, who would restrain which body parts—and, after he was restrained, that they were to walk him down the stairs for placement in the restraint chair waiting on the lower-level.  (Gacke Statement; Klebs Dep. at 51.)  Some of the SORT officers were given handcuffs and shackles to use during the extraction, per standard procedure. (Gacke Dep. at 44–45.)

The extraction was recorded by SCCO Shance Newland.[5]  (Newland Incident Report; Gacke Dep. at 69–70.)  Following the pre-extraction footage of Harrell recorded

---

[5] The video was provided to and reviewed by the Court.  The initial struggle and the actions of the SCCOs in the cell are not entirely visible.  However, the video's depiction of the extraction is corroborated by the SCCOs' deposition testimony and other evidence in the record.

by Maslonkowski, the video shows the beginning of the extraction with the SORT lined

up on the stairs in front of Harrell's cell with Stowell in the lead, followed by Michalski,

Klebs, and Seifermann.  (Jail Video.)  Gacke, Maslonkowski, and Hill, as supervisors,

were also standing by the cell door.  (See id.)  Maslonkowski and Hill were each

equipped with a Taser.  (Maslonkowski Suppl. Report; Hill Incident Report.)

Gacke, the Sergeant in charge of the SORT extraction, gave several orders for

Harrell to back away from the door and lay on his bunk, but they were not followed.

(Gacke Statement.)  When Gacke unlocked the cell door at 8:28 a.m. and swung it open

into the hallway, Harrell first attempted to pull the door closed.  (Seifermann Statement;

Stowell Statement; Stowell Dep. at 36; Hill Statement; Hill Incident Report.)  When the

door was fully opened, Harrell charged forward to exit his cell but the officers pushed

against him to get him back in.  (Michalski Statement; Stowell Statement; Stowell

Incident Report; Gacke Incident Report; see Jail Video.)  What happened next is largely

undisputed.  But, because most of the SCCOs involved were named as individual

defendants, the Court considers each officer's conduct separately.[6]

### 1.    SCCO Stowell

Stowell testified in his deposition that Harrell ran towards the open door in a

crouched position—like a football player about to tackle—with a sheet and blanket

wrapped around his face, head, and body.  (Stowell Statement; Stowell Dep. at 54; Jail

---

[6] Heartland Acad. Cmty. Church v. Waddle, 595 F.3d 798, 805–06 (8th Cir. 2010) ("Liability for
damages for a federal constitutional tort is personal, [and] each defendant's conduct must be
independently assessed.").

Video.)  Stowell used his shield to push Harrell back into the cell and felt Harrell's body tense up in an attempt to get upright.  (Stowell Incident Report.)  When Stowell was unable to restrain Harrell with his shield, he dropped the shield.  (Id.)  Stowell then attempted to control Harrell's head and get him lying face down on the floor.  (Stowell Statement.)  Harrell again exhibited great strength and began to lift up so Stowell used a "considerable amount" of his bodyweight to push him back down.  (Stowell Incident Report; Stowell Dep. at 40.)  Both fell to the floor with Stowell's right arm under Harrell's face and a "portion" of his weight on Harrell's back.  (Stowell Dep. at 35.)  Stowell noticed Harrell was still very strong and attempting to stand up, even when he was on the ground—according to Stowell, he had "never felt anything like [Harrell's extreme strength] in [his] life."  (Stowell Statement.)  Within a few seconds, Harrell bit Stowell on his right arm, even though he had the blanket and sheet wrapped around his head.  (Stowell Incident Report; see also Jail Video.)

Once Harrell was handcuffed and shackled by the other SCCOs, Stowell noticed a "change in his disposition" and felt him "go limp in [his] arms."  (Stowell Incident Report.)  Stowell can be seen on the video trying to pull the wet sheet off Harrell's head and neck, saying "he's got this tied so tight around his throat."  (Jail Video; see also Stowell Statement.)  After the sheet was removed and Harrell was turned onto his side, Stowell remarked that Harrell was unresponsive after finding no carotid pulse, noticing no respirations, but observing some finger movement.  (Stowell Statement; Stowell Incident Report; Stowell Dep. at 23, 43–44, 46.)  Stowell attempted to verbally stimulate Harrell, while Gacke touched his face.  (Stowell Incident Report; Gacke Statement;

9

Gacke Dep. at 62–63.)  However, when those attempts failed, Stowell helped carry him

down the stairs, where medical staff was waiting to begin CPR.  (Jail Video.)

**2.**      **SCCO Michalski**

According to Michalski, he entered the cell when Harrell was already on his

stomach on the ground and went to secure Harrell's left side.  (Michalski Statement.)  He

noted that Harrell's resistance was "extremely strong."  (Id.)  Michalski was able to get

Harrell's hands behind his back after struggling with him for a minute and put the

handcuffs on.  (Id.; Jail Video.)  After Harrell's arms were secured, Michalski moved to

help Hill secure and shackle his legs.  (Michalski Statement.)  He stated he had no

bodyweight on Harrell.  (Id.)  Michalski observed that once Harrell's arms and legs were

shackled, he stopped resisting but kept clenching his hands.  (Id.; Jail Video.)

**3.**      **SCCO Klebs**

Klebs was responsible for securing Harrell's right arm.  (Klebs Statement.)

According to Klebs, as the SCCOs and Harrell were struggling on the floor, he was "kind

of on [Harrell's] back, on what would have been [Harrell's] right side[, t]rying to secure

the right arm . . . but not really all, all the way on top of [Harrell]."  (Klebs Statement.)

Klebs repeatedly testified in his deposition that only approximately 25% of his body

weight was on Harrell, with most of his body on the floor.  (Id.; Klebs Dep. at 53–54, 66,

70, 78, 88.)

Following a short struggle trying to get Harrell's arms out from underneath him,

Klebs held Harrell's arms while Michalski locked the handcuffs.  (Klebs Statement; Jail

Video.)  Once Harrell was restrained, Klebs and the others stood up and backed away

from Harrell, taking all of their body weight off him.  (Klebs Statement; Jail Video.)

When Harrell became unresponsive, Klebs observed the SCCOs roll him onto his side to

allow Stowell to assess him.  (Klebs Statement; Jail Video.)  Klebs assisted in carrying

Harrell down the stairs to the lower-level, where medical staff was waiting to start CPR.

(Klebs Statement; Jail Video.)  Gacke ordered Klebs to ride with Harrell to the hospital,

where he stayed until after Harrell was pronounced dead at approximately 10:00 a.m.

(Klebs Statement.)

### 4.   SCCO Seifermann

Seifermann entered the cell after Harrell was already on the ground.  (Seifermann

Incident Report.)  According to him, Harrell did not respond to any commands to stop

resisting and continued to struggle with the officers while they were attempting to

restrain him.  (Id.; Jail Video.)  Seifermann assisted in restraining Harrell's arms with

Michalski and observed Harrell actively resisting until he was cuffed.  (Seifermann

Statement.)  After the sheet was cut away, he observed that Harrell appeared not to be

breathing, so Harrell was brought out of the cell to a more stable working area on the

lower-level.  (Id.)  Seifermann participated in chest compressions and assisted in

maintaining Harrell's airway until the EMTs arrived.  (Id.; Jail Video.)

### 5.   SCCO Hill

Hill entered the cell after Harrell was on the floor and attempted to secure his legs.

(Hill Statement.)  According to Hill, he was lying across Harrell's hamstrings, trying to

bend his legs at the knee to shackle them.  (Id.; Jail Video.)  However, Harrell continued

to kick with considerable strength—including kicking Hill in his chest—so Hill delivered

a "drive stun"[7] with his Taser to Harrell's left calf.  (Hill Statement; Hill Dep. at 60–61,

69, 94.)  The Taser did not appear to have any effect, which made Hill think it was not

working properly.  (Hill Incident Report; Hill Dep. at 69, 93–94.)  Hill then handed the

Taser to Maslonkowski and continued to struggle with Harrell's legs.  (Hill Suppl.

Incident Report.)  After the handcuffs were secured on Harrell's arms, shackles were able

to be placed on his ankles.  (Hill Incident Report.)  Hill observed all the officers back

away at this point, and with no response from Harrell, they rolled him onto his side to

check for injuries.  (Hill Statement; Jail Video.)  Hill reached his hand down to check for

respirations on Harrell's midsection but did not feel any.  (Hill Statement.)  Hill then

radioed for an ambulance and assisted carrying Harrell down the stairs to the lower-level.

(Id.; Jail Video.)

### 6.    SCCO Maslonkowski

Maslonkowski entered the cell after all the other SCCOs, to assist with a still-

combative Harrell, who was kicking his legs, thrashing his arms, and not communicating

with staff.  (Maslonkowski Statement.)  According to Maslonkowski, he ordered Harrell

to stop resisting, and because of Harrell's noncompliance, he placed his Taser against

Harrell's upper back while Hill's Taser was still in his left hand.  (Id.; Jail Video.)  He

stated he did not fire his Taser because the restraints had been applied and he felt there

was no longer a need.  (Maslonkowski Incident Report.)  Maslonkowski then helped

---

[7] Using a Taser in "drive stun" mode is a pain-compliance tool.  Brown v. City of Golden Valley, 574 F.3d 491, 495 n.3 (8th Cir. 2009).  This is different than using the Taser to fire metal probes, which paralyzes the entire body.  McKenney v. Harrison, 635 F.3d 354, 364 (8th Cir. 2011).

Stowell cut the thickly folded and wrapped sheet off Harrell's head because he thought, while it was loose, it was not easily removable due to Harrell's position.  (Maslonkowski Statement; <u>see</u> Jail Video.)  At this point, Maslonkowski observed that Harrell was no longer combative and was unresponsive.  (Maslonkowski Incident Report.)  He left the cell, went to the lower-level, and prepared an oxygen kit and bag valve mask for when Harrell arrived there.  (<u>Id.</u>)

## VI.    Aftermath

Once Harrell was on the lower-level, jail staff—including Stowell, Michalski, Seifermann, and Kimberly Gertken—took turns doing CPR, while the nurses supplied oxygen.  (<u>See</u> Carlson Incident Report; Jail Video.)  Gertken readied the automatic-external-defibrillator machine ("AED") and applied the pads to Harrell's chest, but the AED advised "no shock."  (Gertken Incident Report; Stowell Incident Report; Jail Video.)  An ambulance arrived at 8:44 a.m. and EMTs assumed CPR.  (Carlson Incident Report; Jail Video.)  Harrell was lifted on a stretcher at 9:15 a.m. and transported to St. Cloud Hospital, where he was pronounced dead at 10:00 a.m.  (Carlson Incident Report.)

An autopsy was performed on Harrell the same day he died by a Ramsey County Medical Examiner.  (Hively Aff. Ex. J.)  He determined the immediate cause of Harrell's death was "sudden unexpected death during restraint" and another significant contribution to his death was an "altered mental status."  (<u>Id.</u>, Cause of Death Worksheet.)  Although the precise manner of Harrell's death could not be determined, the examiner concluded it was not caused by injury or trauma.  (<u>Id.</u>)  The examiner later

filled out a form stating there was no alcohol in Harrell's body but there was evidence of over-the-counter cold medicine and marijuana.  (Id., Final Autopsy Protocol.)

More than three years later, Ryan commenced this action against Armstrong, Culloton, Stowell, Michalski, Hill, Klebs, Maslonkowski, Seifermann, and Jensen (the "Individual Defendants"), as well as Stearns County.  The Complaint alleges that each Individual Defendant used excessive force on Harrell (Count I) and negligently caused his death (Count V), Armstrong and Culloton were deliberately indifferent to Harrell's medical needs (Count II), and Stearns County is liable for failing to adequately train its officers (Count III and IV).  With discovery complete, Defendants now move for summary judgment.  Their Motion has been fully briefed, the Court heard argument on December 1, 2015, and the Motion is now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc); Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Beard v. Banks, 548 U.S. 521, 529–30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009).  The nonmoving party may not rest on mere allegations or denials, but must

show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

The Complaint is not a model of clarity with respect to Ryan's claims and the seemingly random assortment of SCCOs he has named as defendants; Ryan's Memorandum adds little clarity to his claims or the facts ostensibly supporting them.  He appears to seek redress under the Fourteenth Amendment's substantive due process clause for violations of Harrell's Fourth Amendment (excessive force, Count I) and Eighth Amendment (deliberate indifference, Count II) rights.  (See Compl. ¶¶ 61–62, 73–74.)  However, the Supreme Court has made clear that *substantive* due process is not the appropriate vehicle for claims where, as here, there is a more definite constitutional provision that protects against certain government behavior.  Cnty. of Sacramento v. Lewis, 523 U.S. 833, 854 (1998).  As such, the Court will analyze Ryan's claims directly under the Fourth and Eighth Amendments, as applied to state actors and pretrial detainees through the Fourteenth Amendment Due Process Clause, rather than as substantive-due-process claims.  See Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015); Walton v. Dawson, 752 F.3d 1109, 1117–18 (8th Cir. 2014).

## I.      The Individual Defendants[8]

Ryan alleges Armstrong and Culloton were deliberately indifferent to Harrell's "obvious" need for medical attention during the midnight shift.  He also asserts each Individual Defendant used excessive and unreasonable force when extracting Harrell from his cell.

The Individual Defendants respond, albeit briefly, that they are entitled to qualified immunity.  To analyze this assertion, the Court must conduct a two-part inquiry, and it may exercise its discretion in deciding which of the two prongs should be addressed first.  Pearson v. Callahan, 555 U.S. 223, 235–36 (2009).  It must assess whether (1) the facts alleged, when viewed in the light most favorable to Ryan, show that the challenged conduct violated a constitutional right and (2) the constitutional right at issue was clearly established on the date in question.  E.g., Avalos v. City of Glenwood, 382 F.3d 792, 798 (8th Cir. 2004) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  Because the Court finds that no constitutional violation has been shown, it need not address the other prong of the qualified-immunity analysis.

---

[8] This analysis concerns only the claims against the Individual Defendants in their individual capacities, as official-capacity claims are the functional equivalent of claims against the municipal entity in question, here Stearns County.  See, e.g., Rogers v. City of Little Rock, Ark., 152 F.3d 790, 800 (8th Cir. 1998).  The claims against Stearns County are discussed below.

### 1.    Deliberate Indifference

The Eighth Amendment prohibits cruel and unusual punishment, which includes the denial or inadequacy of medical care for incarcerated individuals.[9] See Estelle v. Gamble, 429 U.S. 97, 103–04 (1976); Allard v. Baldwin, 779 F.3d 768, 772 (8th Cir. 2015).  A claim that a correctional officer was "deliberately indifferent" to an inmate's medical condition "requires the inmate-plaintiff to demonstrate that he suffered from an objectively serious medical need and that prison officials actually knew of, but deliberately disregarded, that need." Meuir v. Greene Cty. Jail Emps., 487 F.3d 1115, 1118 (8th Cir. 2007) (citing Dulaney v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)).

"Deliberate indifference has both an objective and a subjective component." Butler v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006).  The objective component requires Ryan to show Harrell was suffering from an objectively serious medical need. E.g., Grayson v. Ross, 454 F.3d 802, 809 (8th Cir. 2006).  The Court will assume, *arguendo*, that he was.  The inquiry then turns on the subjective component, which requires Ryan to show Armstrong and Culloton knew of, but deliberately disregarded, that need. E.g., Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009).  Ryan must show more than "gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.  Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Popoalii v. Corr. Med.

---

[9] Technically, because Harrell was a pretrial detainee, his claim for deliberate indifference must be brought under the Fourteenth Amendment Due Process Clause and not the Eighth Amendment.  See Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004).  However, regardless of which Amendment is utilized, the deliberate-indifference standard is the same.  See id.

Servs., 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted). The Eighth Circuit has labeled this an "onerous standard," Thompson v. King, 730 F.3d 742, 747 (8th Cir. 2013), requiring a prisoner to "clear a substantial evidentiary threshold," Nelson v. Shuffman, 603 F.3d 439, 449 (8th Cir. 2010). Moreover, the Court must consider each Defendant's conduct individually and "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Letterman v. Does, 789 F.3d 856, 862 (8th Cir. 2015).

Ryan cannot establish that either Armstrong's or Culloton's conduct amounted to deliberate indifference. This is simply not a situation in which the officers "ignor[ed] the detainee." Krout, 583 F.3d at 569. Both continued to check on him throughout the night during their WBCs. (Culloton Incident Report; Armstrong Incident Report.) Though Harrell was acting oddly, both officers testified in their depositions that he was not harming himself (Culloton Dep. at 47; Armstrong Dep. at 43, 46), and he had no outward manifestation of an injury or a need for medical attention, (Culloton Dep. at 14, 18; Armstrong Dep. at 31); cf. Jones v. Minn. Dept. of Corr., 512 F.3d 478, 482 (8th Cir. 2008) (outward manifestations alerting a medical need include pregnant inmate who is bleeding and inmate with swollen and bleeding gums). Based on their observations, neither Culloton nor Armstrong thought Harrell was suffering from an emergency or a medical crisis. (Culloton Dep. at 40, 47, 51; Armstrong Dep. at 40, 43, 47–48, 51–52, 60, 74, 87.)

Moreover, both officers had reason to believe Harrell's conduct was due to him being high. See Allard, 779 F.3d at 772 (holding that even "negligent misdiagnosis" does

not rise to the level of deliberate indifference).  Culloton testified in his deposition that he was told at the shift-turnover meeting that Harrell was apparently high and acting strangely.  (Culloton Dep. at 51; see Hively Aff. Ex. J, Initial Classification Worksheet and Questionnaire; Armstrong Dep. at 32, 35–36.)  Armstrong testified in her deposition that inmates who act strange while under the influence of drugs or alcohol are quite common in the Jail.  (Armstrong Dep. at 21.)  Furthermore, both officers testified in their depositions that they did not believe Harrell's behavior was unusual and, instead, thought it consistent with that of many other inmates in the Jail.  (Armstrong Dep. at 41–42, 44, 47–48, 56–57, 62, 69; Culloton Dep. at 28–31, 37, 42, 45.)  Ryan has not put forth evidence to the contrary—no evidence of similar Jail deaths, a medical diagnosis, or anything that would tend to show Armstrong and Culloton should have thought otherwise.  See Grayson, 454 F.3d at 809.

Each side relies on the Eighth Circuit's recent decision in Letterman, albeit for different propositions.  There, two corrections officers were denied summary judgment after having been explicitly informed the inmate had not moved in several hours and that medical personnel had requested his cell door be opened to provide assistance.  789 F.3d at 860.  Only these two officers could open the door, and still, both refused to open it.  Id.  The court found a jury could infer from this evidence of outright refusal that these two officers were deliberately indifferent to the inmate's obvious medical need.  Id. at 863–64.  The record here does not support a similar finding.  Instead, the record here is akin to the third officer in Letterman, who took "reasonable measures," although delayed, to

"abate [the inmate's] risk of injury"; her conduct did not constitute *deliberate* indifference. Id. at 865 (emphasis added).

In this Court's view, Armstrong and Culloton took "reasonable measures," even if not perfect or exhaustive, by continuing to conduct WBCs on Harrell, keeping notes of his behavior, and informing Gacke at the shift-turnover. See, e.g., Allard, 779 F.3d at 772; Krout, 583 F.3d at 567 ("It is not enough merely to find that . . . [the officer] should have known about the risk.") (internal quotations omitted). Because Ryan has not submitted sufficient evidence to create a genuine issue for trial of whether Culloton and Armstrong were deliberately indifferent, summary judgment is granted for them on Count II.

### 2.    Excessive force

Ryan alleges all the Individual Defendants used excessive force while extracting Harrell from his cell. As a preliminary matter, Ryan has failed to allege how Armstrong, Culloton, or Jensen used excessive force, as the evidence fails to show that these three were involved in the extraction.[10] See Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985) (claim not cognizable in § 1983 action when plaintiff does not allege defendant was personally involved in, or directly responsible for, incidents that injured plaintiff). Defendants' Motion will therefore be granted as to these individuals.

---

[10] Armstrong and Culloton were no longer on duty when the extraction occurred. (See Armstrong Incident Report; Culloton Incident Report.) Jensen—a Jail Investigator and Captain of the Patrol Unit (a separate division in the Jail that housed the investigations unit)—did not supervise the booking unit or any SCCOs in the Jail and had no involvement with, or responsibility for, Harrell. (Jensen Dep. at 9–11, 26, 44.)

As for the remaining Individual Defendants who were involved in the extraction (Stowell, Michalski, Klebs, Seifermann, Hill, and Maslonkowski), Ryan argues they used excessive, unreasonable, and deadly force on Harrell.  In a § 1983 excessive-force case brought by a pretrial detainee, the Fourth Amendment standard of "objective reasonableness" applies.[11]  Kingsley, 135 S. Ct. at 2473.  The court must determine the objective reasonableness of the force used from the perspective of a reasonable officer on the scene, including what the officer knew at the time and not with the 20/20 vision of hindsight.  Id. (citing Graham v. Connor, 490 U.S. 386, 396 (1989)); accord Wilson v. Spain, 209 F.3d 713, 715–16 (8th Cir. 2000).  This standard cannot be applied mechanically and instead turns on the facts and circumstances of each particular case. Kingsley, 135 S. Ct. at 2473.  Several factors that are relevant to this inquiry include: the relationship between the need for the use of force and the amount of force used, the extent of the plaintiff's injury, the threat reasonably perceived by the officer, and whether the plaintiff was actively resisting.  Id. (citing Graham, 490 U.S. at 396).

Apart from Ryan's conclusory assertions that the SCCOs used excessive force, he argues two methods of force were excessive and unreasonable: the use of prone restraint with the application of bodyweight to Harrell's back and the two Taser drive-stuns.

---

[11] Again, the lack of clarity in Ryan's Complaint and Memorandum makes his argument confusing, but it appears he is arguing the Individual Defendants violated Harrell's *Eighth* Amendment right to be free from cruel-and-unusual punishment and the use of excessive force. (Mem. in Opp'n at 32 (citing Owens v. Scott County Jail, 328 F.3d 1026 (8th Cir. 2003).)  In doing this, he essentially wants the Court to apply the arguably *less*-favorable Eighth Amendment standard—"whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm"—as though Harrell was a *convicted* prisoner.  Cnty. of Sacramento, 523 U.S. at 853 (quoting Whitley v. Albers, 475 U.S. 312, 320–321 (1986)).  However, the Supreme Court recently opined this is not the correct standard to apply in this situation.  See Kingsley, 135 S. Ct. at 2475.

However, even taking the evidence in the light most favorable to Ryan, he has failed to show the officers' actions were objectively unreasonable given the circumstances.

Most notably, Ryan's arguments fail to acknowledge Harrell's continued aggressive behavior and the officers' corresponding need for using force.  The SCCOs testified in their depositions that Harrell was strongly and actively resisting, until he was handcuffed and shackled.  (Stowell Dep. at 39, 61–62; Hill Dep. at 72–73, 86–87; Seifermann Dep. at 82; Michalski Dep. at 69; Klebs Dep. at 88; Maslonkowski Dep. at 52.)  The level of Harrell's strength and resistance is evidenced by the fact that several of the SCCOs exhibited minor injuries after the extraction.  (See Michalski Incident Report; Seifermann Incident Report; Stowell Incident Report; Hill Incident Report.)

The evidence shows Michalski, Klebs, and Seifermann used some force while struggling to get Harrell's arms behind his back and in handcuffs.  But, the use of this force was reasonable because Harrell was non-compliant, actively resisting, and trying to keep his arms underneath him to prevent being handcuffed.  See, e.g., Risdal v. Nixon, 589 F. App'x 801, 803 (8th Cir. 2014) (concluding the force used to handcuff and restrain inmate was objectively reasonable, in light of his highly aggressive behavior); Wertish v. Krueger, 433 F.3d 1062, 1066–67 (8th Cir. 2006) (using force to pull arms from underneath arrestee to secure handcuffs was reasonable).

Klebs testified in his deposition that a portion of his bodyweight was on Harrell while he pulled Harrell's arms from underneath him and Stowell stated he may have had a "considerable amount" of his weight on Harrell's back at some point.  Yet, considering the extreme strength and resistance Harrell was exhibiting, and the fact that Harrell

initially charged out of his cell, this evidence does not make the SCCOs use of force to restrain and control Harrell unreasonable.  See, e.g., Dyer v. Blankenship, No. 4:07CV02105 AGF, 2011 WL 1226941, at *14 (E.D. Mo. Mar. 30, 2011); Williams v. Chambers, No. 4:07CV01409 ERW, 2010 WL 481299, at *13 (E.D. Mo. Feb. 5, 2010).[12]

While the evidence shows Harrell may have been Tasered twice,[13] the evidence also shows Harrell kicked Hill's chest and bit Stowell's arm, and was a threat to the safety of the officers in the cell.  In the Court's view, the deployment of the Taser, even twice, was a proportionate response and was not unreasonable under the circumstances. Compare Procknow v. Curry, 26 F. Supp. 3d 875, 887–88 (D. Minn. 2014) (Kyle, J.) (two Taserings were justified and reasonable because man was still resisting arrest), with Hollingsworth v. City of St. Ann, 800 F.3d 985, 997 (8th Cir. 2015) (compiling cases which held use of Taser on *nonviolent* inmate was disproportionate and unreasonable).

While the ultimate "injury" here is extreme and unfortunate, the inquiry must focus on the "nature of the force" used rather than on "the extent of the injury," although the latter is still relevant.  See Wilkins v. Gaddy, 559 U.S. 34 (2010); Chambers v. Pennycook, 641 F.3d 898, 906 (8th Cir. 2011).  Based on the totality of circumstances in this case, the Court finds insufficient evidence to create a genuine issue of material fact

---

[12] Williams and Dyer are strikingly similar to the case at hand, and the Court finds them persuasive.  In each case, the arrestee repeatedly failed to comply with verbal commands, actively resisted arrest for several minutes, and exhibited extreme strength.  Dyer, 2011 WL 1226941 at *14–15; Williams, 2010 WL 481299 at *4–6.  Each case found the officer's use of the prone position with pressure applied to the arrestee's back objectively reasonable under the circumstances.  Dyer, 2011 WL 1226941, at *14; Williams, 2010 WL 481299, at *13.

[13] Ryan contends Harrell was Tasered twice, while Hill does not recall Tasering Harrell more than once.  According to the Taser Download Printout, Hill's Taser was activated twice: first at 8:34:33 and then again at 8:34:52.  (Hively Aff. Ex. J.)

that the level of force used was excessive.  Accordingly, summary judgment is granted

for the Individual Defendants on Count I.

## II.     Stearns County

In Counts III and IV, Ryan alleges a failure-to-train claim against Stearns County

and Jensen in her supervisory role.[14]  "In order for municipal liability to attach, individual

liability first must be found on an underlying substantive claim."  Abbott v. City of

Crocker, 30 F.3d 994, 998 (8th Cir. 1994); accord McCoy v. City of Monticello, 411 F.3d

920, 922 (8th Cir. 2005).  Ryan has not created a material fact dispute as to the

underlying claims against the Individual Defendants and the Court has granted them

judgment as a matter of law.  Therefore, Stearns County cannot be held liable on a

failure-to-train or supervise theory.  See McCoy, 411 F.3d at 922 (granting summary

judgment for defendant officer on excessive-force claim precluded City from being held

liable on an unconstitutional policy or custom theory or failure-to-train theory).  As such,

the Court will grant the Motion with respect to Ryan's claim for failure-to-train.

## III.    Wrongful death

Ryan also brings a state-law claim for wrongful death against the Individual

Defendants.  However, because Ryan fails to establish a constitutional violation, the

Court has dismissed all claims over which it has original jurisdiction.  It may, now,

decline to exercise supplemental jurisdiction over the remaining state-law claims.  See 28

---

[14] Ryan argues Jensen is subject to liability because she ratified and approved of the SCCOs'
actions and failed to discipline them after-the-fact.  (See Compl. ¶¶ 78, 83.)  However, Ryan has
not submitted any evidence to support this allegation and does not even mention Jensen's name
in the relevant section of his Memorandum.  (See Mem. in Opp'n at 38–42); Walton, 752 F.3d at
1117–18.

U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966)

("Certainly, if the federal claims are dismissed before trial, even though not insubstantial

in a jurisdictional sense, the state claims should be dismissed as well.").  Accordingly,

this Court declines to exercise supplemental jurisdiction over Count V of Ryan's

Complaint, and this count will be dismissed without prejudice.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 21) is

**GRANTED**, and Ryan's federal claims (Counts I-IV) are **DISMISSED WITH**

**PREJUDICE**.  The Court **DECLINES** to exercise supplemental jurisdiction over Ryan's

remaining state-law claim (Count V), and that claim is **DISMISSED WITHOUT**

**PREJUDICE**.[15]

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date: January 5, 2016                    s/Richard H. Kyle
                                         RICHARD H. KYLE
                                         United States District Judge

---

[15] See 28 U.S.C. § 1367(d).